Case No. 18-5154 et al., American Bankers Association v. National Credit Union Administration Appellant. Ms. Aguilar for the appellant, Mr. Long for the appellate. Mr. Aguilar, good morning. Before you start, let me just welcome on behalf of the panel our visitors from Kosovo. We're very glad to have you this morning. All right. May it please the Court, Daniel Aguilar for the National Credit Union Administration. The agency here adopted definitions of local community and rural district that help to ensure that all Americans can access credit and savings through economically viable credit unions. The definitions expanded on the potential membership for community credit unions by relying on the same kinds of statistical evidence and population limits that the agency had previously used. Those definitions are a reasonable exercise of the agency's statutory authority. First, I'd like to begin with the inclusion of combined statistical areas within the definition of local community. A combined statistical area is a geographic area where, by definition, there is statistical evidence that there are at least 15 percent of the total population between areas that live and commute together in the same area. That's the same kind of commuting measurement that is used to determine whether something's a metropolitan division based around a secondary county. That's something that the agency had previously considered to be a local community. And everyone agrees that the agency had statutory authority to do so and that an enunciated or reasonable explanation of why that's a local community. And so the thought that somehow these are areas that cannot be considered local because they aren't geographically limited enough or that they don't have a sufficiently small population just doesn't bear out. Because the agency has continuously defined local communities to include areas that are single political jurisdictions, like a county or a city. Ms. Dragweller, is there any statutory limit on how geographically large a local community can be as long as there is the contiguity and the community connection? Well, I think in terms of a statutory limit, I think it's what the Supreme Court has recognized. It can't be the entire country. It can't be the entire country minus one state. I think what really does the work, if you're analyzing this, is not saying that the definition is manifestly contrary to statute. It's has the agency actually reasonably explained why this is a local community. And if the agency can't have a reasonable explanation for why a dispersed, geographically large, really populous area is still a local community, then that definition would be arbitrary and capricious. There's not any evidence that local was added to distinguish the kinds of communities at issue here from, let's say, a virtual electronic community. I mean, it occurs to me that more and more we have virtual communities, but I didn't see anything in the legislative. I wasn't sure that Congress was necessarily concerned with that in 1998. A lot has changed in terms of being able to virtually communicate with people. As the district court recognized, what the statute used to include is community. And what the district court noticed that community can basically be the entire world. Local does some work, and so the agency looks at that work, and what it's learned is by experience. First, it said in 1998, when the statute got amended, we'll look to simply narrative pieces of evidence. You bring us documentation, we'll determine whether that's a local community. And then determined by experience, you know what, a single political jurisdiction, a county or a city, is a local community. And everyone agrees that's within the statutory authority that Congress vested in the agency. And those counties and cities can be quite large. San Bernardino County has an area about the size of Switzerland. Cook County around Chicago has a population about the size of Ireland. But we all agree that those can be considered local communities. And from there, you add a core-based statistical area, a single urban center or a couple of urban centers in the surrounding counties, that share economic commuting patterns, people living and working together. And then from there, the agency said, we'll keep that same population limit that we used for the core-based statistical areas, and we'll go to combined statistical areas that still have that same evidence, objective evidence, that people are living and working together. Can a combined statistical area carve out the core like the core-based statistical area can? Yes, it can be any portion of a combined statistical area. When the agency introduced core-based statistical areas, it included a requirement that it has to serve the urban core, because it believed that that would better tie the community together and be able to serve people of modest means. What the agency explained in this rulemaking that's challenged is that we are going to consider any portion of these to be local communities, so far as they're defined, because we consider the whole area to be a local community. And we're going to use our other supervisory powers to ensure that there's not any redlining, which, again, is a hypothetical concern. There's no evidence that... How can the two means that they articulated to ensure that there's no redlining have any effect on the redlining issue? Because, by definition, those two means won't apply to consumers within the core. Well, so, to the first, if you're concerned about a new credit union that doesn't have any members yet, if that prospective credit union comes forward with a plan that says, you know, we want to essentially create a local community that has a donut around an urban core, the agency can say, why are you doing that? That doesn't make any sense. And if the reasons that the credit union gives seem pretextual, there's nothing that compels the agency to charter that community. It says, no, we think you probably need to include that, and if you're not willing to do that, then we don't give you a charter. What's the basis for that discretion? Because I think the bankers disagree with you. They characterize the statute as creating automatically eligible communities. So I think there are two steps here. The first is, have you identified an area that can be considered at all to be a local community? And so that's what the categorical definitions are for. If you need a single political jurisdiction in a statistical area, that is a local community. But the second question is, do you deserve a charter? And that requires having an actual business plan that you're going to go out and serve the area, be able to provide means to everyone, and be economically viable. And the agency, that's a back-and-forth process that sometimes takes months on the agency saying, we think you probably need to include this area. We aren't actually sure that you can serve this area over here. What precise regulatory or statutory language can the NCUA rely upon to deny a charter based on a concern about what you call a donut-sized area? So I think there would be the agency's general discretion to say, if we don't think that this can be a viable credit union and serve the relevant area, we don't think that that can be chartered. Is there precedent for that? Has the agency done that? You know, if somebody wanted to charter just, you know, Winnetka and Highland Park and Evanston and not do any of the poor communities around Chicago, is there any example of when, you know, the Beverly Hills Credit Union was denied because the community wasn't serving the statutory purposes? Well, so that hasn't happened for two reasons. One is that the agency just hasn't seen that. The other is that it used to be a requirement when the rule was initially promulgated in 2010 for poor-based statistical areas. So to that point, there are already 136 credit unions that serve poor-based statistical areas. Because they were chartered under that previous rule, they already serve that urban core. And so if they want to amend their charter to exclude the urban core, the agency has to approve that before that becomes effective. And if any of the members or if the agency has any concern that there's invidious discrimination going on, they can reject that amendment. Is that true that every, so basically every major urban core is already served by a credit union? Because that wasn't in the record, and I was wondering about that. It wasn't in the record because we were explaining that we think the other supervisory powers. I'm informed that most population centers in the United States that are based around a poor-based statistical area have a credit union within them. So for the example that the bankers gave in their reply brief about Buffalo and New York, the credit union there expanded south to include three different cities, but it didn't include Buffalo. Notably, it already included one of the urban centers in that poor-based statistical area around Buffalo and Niagara Falls. It served Niagara Falls, which is an urban center. And Buffalo City is already served by four different federal credit unions, Buffalo Metropolitan, Empire One, Great Area, Erie Metro. And so if any of those federal credit unions want to amend their charters to try to exclude that urban core, they need NCUA approval, and if any of the members object, the NCUA will investigate and prohibit any invidious discrimination or redlining. And Mr. Aguilar, those are community credit unions, not... Yes, those are community. There are additional occupational and associational credit unions that serve part of the Buffalo area, but these are the community credit unions that serve that. Let me ask you about cutting out the core area. I know analogies are never good, but I see it like the spokes of a bike wheel, and the hub is the core urban area. And what connects all of the edges are the commuters that go into the core. And if you take that hub out, which is what binds all of the edges or all of the spokes, how do you still have a local community if they're made a community because of their commuting into the urban core and you remove that? Well, so I just wanted to give an anecdotal example that the district court here used. If you have a core-based statistical area around Washington, D.C., you can include Bethesda, you can include Prince George's County, but you wouldn't think that if you did not include Washington, D.C., that those people still wouldn't be part of the local community, that they can only be a local community if you also include people within Washington, D.C. But secondly, the reason that you're creating that local community around the core-based statistical area is because the evidence is showing everyone in these counties is living and working and commuting together. They come to the core, but then they also go back to the other surrounding counties and where they live. And if everyone has that same tie to the core, that's a commonality that extends around those outlying areas, even if you aren't including that part of the urban core. And remember, this was a challenge that the plaintiffs brought as a statutory challenge, that there is no way that the statutory term, local community, can include these areas. That can't be right. The statute permits more pervasive definitions that can go along with the reasoning that the agencies give. If what they're asserting is an arbitrary and capricious challenge, I think the agencies reasonably explained that along the lines of the district court case. Can you address the mootness issue specifically? How should we think about the change in composition of the board as affecting the mootness challenge? I don't think that affects the mootness challenge as a legal point. I mean, in the city of Mesquite, the city council could have changed the same day or in the interim. I don't think that affects it. To the extent the court's concerned about what the current board believes, I can represent that the general council has informed me that the current board has the same intention to reenact the same definition of combined statistical areas being local community. Both of the new members? Yes. If you want any supplementary declarations on that, we're happy to provide it, but I can represent that right now. That places us squarely in the Supreme Court's case of the city of Mesquite. That's a case where the challenge regulation was rescinded during the appeal. The city said, we are going to reenact this if we prevail. And the Supreme Court cited the transcript for that assertion by the city's lawyer. And the court said, that's a live dispute. That's something where we can reach the merits. I still want to follow up on something that Judge Pillard brought out. And that is, I wanted to ask you why, I didn't see in the record, why you lopped off these four areas. And from what I understand, they are already served. All of the urban areas have community credit unions in them. That's my understanding, the vast majority. I don't know that it's in the record, but that may be the reason why you decided to do it, that they were already served. There are additional reasons if you'd like them. Well, that's good enough. You've also said in this chartering and field of membership manual, that with respect to the concern about not serving the low income and underserved populations, that experience confirms that the agency's evaluations and so forth about your supervisory role. Now, do you dispute what the amicus says, that the supervisory role that your agency performs doesn't even come in until after you've defined the local community, so that if you excise the urban core, you're never going to, or am I wrong, you're never going to exercise any supervisory capacity to make sure they're served? I think as I was saying, if the credit union comes forward with a plan to sort of draw around an urban core, the agency can say, that seems strange, you need to explain that better to us. And if the agency isn't satisfied in that back and forth explanation, it's already considered a local community, but then the question is, do you get chartered? And as the agency is engaging in that back and forth with the prospective credit union, if it's not satisfied with those answers, it can deny a charter if it believes that this is based on pretext or discrimination. Mr. Aguilar, even if it's not based on pretext for discrimination, but just seems as a policy matter that the viability of the business plan is to serve, you know, maybe less risky and wealthier communities, is there precedent, or can you point in any more specific way to authority that the agency has to deny for something other than economic viability? I mean, I understand the chartering to be principally trained on the economic viability of the proposed credit union, am I wrong? And ensuring that you can follow through with your business plans, make sure that you can serve everybody for the first three years. I think what the agency is talking about in its experience about, we have this requirement that you need to serve the urban core, we think that we can serve people of low income, modest means, effectively other ways, is borne out in the 2016 annual report that we cited in our response and reply brief. There it was talking about low income federal credit unions, which is a special designation they can have. And that allows them, you know, to accept non-member deposits, greater access to capital accounts, greater access to loans and grants. And there it said, low income credit unions, just in the past decade, have increased in membership from 6 million to 39 million. They've increased in number from, I think, 1100 capital accounts from 47 billion to 400 billion. The agency is pretty confident that it can ensure that credit unions continue their congressional purpose of serving people of low and modest means, but also expanding their services to other areas. What should we do about the statistics cited by your opponents that show that banks serve a higher percentage of people of modest means than credit unions? Are you citing to the GAO report, I think, that they were relying upon? I think so. So I read that, and I'm not exactly sure that that's what it says. What the GAO report, its preamble says is that we don't have a lot of statistics about the kinds of people that credit unions serve because that data set isn't out there generally. There's a 2004 study, I believe by the Fed, that has one data set that indicates that maybe credit unions are serving fewer people than banks. And then the GAO report says, because we just don't know what this is, and it could be the case that they're serving fewer people, we need more data. So I don't think that report actually says that credit unions are serving fewer people than the banks are. And as I noted, if you look at that 2016 report, you can see essentially the astronomical growth of low-income credit unions just over the last 10 years as the agency has really pushed those designations to allow credit unions to flourish and thrive and serve people of modest means. I mean, this is obviously not a legal question, but just out of curiosity, I know a credit union has to be non-profit. Who starts a credit union? I mean, why would someone... I confess that I've not been involved in that process of trying to form the credit union. I know in the 34 Act, when they were initially starting credit unions, you see credit unions on their website put forth history of this was started by several employees of a construction railway in Buffalo, New York, or for the Justice Federal Credit Union. It was started by employees of the Department of Justice. And so it seems that when people recognize that they have a common bond, then they'll try to come together to form a credit union to help those in their community. I'm happy to discuss any questions about the... I still have a question. It seems to me that you have created in the core-based statistical area where you remove the core, sort of a theoretical local community. And then today you've said, well, if there's any mistake with that, we'll get to it when we decide whether to give a charter or not. Can you give me your best understanding of why you did excise or why your agency excised the core area? Sure. It's because of the main driving reason is the population limit for core-based statistical areas of 2.5 million. If you have a really dense and populous urban core and you're required to serve that, and then you can go out into the outlying areas, it's really hard to get very far into those other areas. And as the amicus, the Credit Union National Association notes, the fastest growing area for poor people in the United States is in the suburbs. So if you're required by necessity to serve the urban core, your community credit union can't get far out into other areas that may lack financial services. So I think what the agency was trying to apply, and this is at JA-165, is we want to be able to allow the credit unions to expand into further communities. If it costs a lot of money to set up shop in the urban core and you don't have those resources initially, then go out and establish yourself or become economically viable. And then if you want to come into the urban core at that point, sure, you can, because the purpose, again, is to extend the access to credit and savings to everybody, primarily to people of modest means, but to everyone in general as well. And the agency's been furthering that mission through its experience in revising these definitions over the last 20 years. All right. So have you made clear on the record that your decision to leave the core and go to the suburbs where some low-income or less affluent people can borrow from you, that that's one reason you did it? I mean, yeah, the reasons are at JA-165. This is where they're saying the reasons that everyone has said that the core requirement is probably not necessary. Requiring the core hinders their ability to adapt and establish a marketplace footprint in a chosen area. They divide and exclude portions of viable communities. They require credit unions to sacrifice service to non-core areas, and it's a disincentive to serve core-based statistical areas that include highly populated urban areas. And those are the reasons that the agency is weighing in making a policy decision. Again, not a statutory prohibit, but a policy decision on whether they should retain this requirement or modify it. And just on the rural district's points, I think their main complaint is that by having a population cap of a million people and a population density of 100 people per square mile or less, it can no longer reasonably be considered a rural district. But if you look at that, 100 people per square mile is about one person every six and a half acres. And the agency had previously allowed rural districts to go up to a million people, and by necessity they're going to have to cover large areas of land where people are geographically dispersed. That's permitted by the statute, and the agency gave reasonable reasons why you need a lot of people in order to form a capital base for an economically viable credit union. Thank you. Thank you, Your Honor, and may it please the Court. Robert Long, representing the American Bankers Association. If I may start with the combined statistical area issue. The primary problem with that, we think, is not simply how big it is.  But we think the statute clearly requires that there be a meaningful interaction and common bond, and NCUA, the agency, actually agrees with that for purposes of local communities. Now, they've abandoned it for rural districts, and we think that's a mistake. But for local communities, that's not something that this Court has to find as a requirement of a local community. We think it clearly is because of Section 2 of the 1998 Act that says a meaningful affinity and bond is essential to the fulfillment of the public mission of credit unions. But NCUA says that is an essential requirement. And the basic problem with the combined statistical area is it's what the district court called a daisy chain. It's much worse than the problem with the hub and stoke of combined statistical areas The way they're defined, and this is just because we're not saying that there can't be a technical definition, but this particular technical definition does not fit the concept of a geographical area that is going to predictably have interaction and common interests. Because all a combined statistical area is two or more core-based statistical areas that have a fairly small amount of commuting back and forth with an adjacent core-based statistical area. So we give an example on page 35 of our brief, which is the combined statistical area that we live in. It's got Washington, Baltimore, most of Maryland, a big part of Virginia, some of West Virginia, some of Pennsylvania, 40 cities and counties. And the real part is that it is very big. We think it's too big. But the real problem is, and you can even see in the census data, which we think is subject to judicial notice and public record, there are entire core-based statistical areas in this larger combined statistical area that have zero commuting activity. And that's used as a proxy for other kinds of interaction. So that's it, and there's zero. So it really cannot be, it just doesn't fit. This is not a concept that works with this statute. Right. So you've done a very vivid job of pointing out this problem. My question is, how do we conceptually combine the Chevron posture and the facial versus as-applied posture? You've come up with possibly authorizable communities. We don't see that happening. And given that the interchange, in the best of circumstances, is kind of an aggregate, on average, level of interchange, it just poses for us a problem of where we get traction in accepting your argument or not. I think you've raised some concerns, but maybe they're completely hypothetical for reasons that have to do with what's attractive as a business matter for a credit union, that even under the accepted existing definitions, the interchanges, as I said, in the aggregate, and there are going to be plenty of people who belong to credit unions who don't have a relationship with other people. So what's the legal framework for us? I think part of the answer is, first of all, it is a categorical rule. They are making a determination as a single rule that any part of any combined statistical area, so long as the population is not more than 2.5 million people, is a single local community. And I think typically, I mean, yes, there could be concerns about ripeness or something, but that's the sort of challenge to a categorical rule that this Court and the Supreme Court regularly entertain. I think you're maybe asking about a different route where you would say, well, there may be problems here, but let's wait and see. For an as-applied challenge. And if the Court sends us on that route, we will try to keep track of it, but there will be a significant problem, which is the way these proceedings are done. When a credit union applies at the NCUA, and this may be a different problem, it is not put out for public comment. There is not a record that's built by anybody who has an interest. It is simply a proceeding between the agency and the credit union. And this came up, we cited a district court case from Utah and one from Pennsylvania where there was a very limited factual record without a lot of the facts that somebody who thought there was a problem would put in. And I think the argument back will be, well, this is permissible under our rule, and so we don't really do a detailed look. We have made a once-and-for-all determination. And I guess one other thing to keep in mind is this is not going to be a rare occasion. Almost half of the combined statistical areas have three or more core-based statistical areas, and more than a quarter have four, five, six, seven, eight, or nine core-based statistical areas. Again, this case I know gets complicated fast, and in some ways I think the agency should have put more to suit the record. All of this you can see, this is all census data, OMB, it's all easy to see. So I don't think it's fair to say, well, this is sort of a hypothetical problem that may or may not arise. This is a lot of the combined statistical areas. It's basically what they are. But we don't know whether it's going to be a lot of the credit unions or even any of them. Let me push a little bit more on this question about you're bringing a challenge, sort of a facial challenge to this regulation on this grounds. And we have authority in this circuit that says it's not enough to show a mere possibility. In this case it's the airport in Air Transportation Association versus Department of Transportation. It's 613 F3rd at 213. It's a 2010 opinion that quotes Reno v. Flores, the Supreme Court. It says it's not enough to show a mere possibility that in that case an airport might apply the antecedents in such a way as to get an unlawful result. Yeah, you can imagine under the general regulation there that it could be applied to get an unlawful result. But that's not enough because we haven't seen that happen. Why aren't we really bound to take the same approach here? Let me mention a couple more things. One is NCUA did approve a significant number, I think about 10, I'm not sure of the exact number, but I think that's roughly the number of local communities that were defined as combined statistical areas. And I think you can find buried in the district court record there is some reference to that because we had to decide what to do with them. So these were promptly being approved because the parties, there has not been this argument made by NCUA that you shouldn't be allowed to have a challenge to the rule as a whole. So that's sort of one point, that there was quite a lot that happened in a very short time, just the time it took the district court to rule. So I don't think this is hypothetical. The other thing is what you were quoting about a possibility, the definition is so not a fit with there has to be actual interaction and common interests. It's almost the opposite. You'd be saying, well, there's a possibility that it might work out that there are some. But you'd have to build a different record in every case. You could never say, well, it's a combined statistical area, so presumptively there is, whoever is going to be in this credit union will have the common interest in interaction. Never could you say that. I had just one related question about that, which is in your mootness filing from April 4th, in your footnote, you mentioned that these applications that were approved for credit unions in combined statistical areas, and then when that rule was superseded, you said that the NCOA has instructed the credit unions not to accept any new members who would only be eligible for membership through the combined statistical area rule. I was having a hard time envisioning what that would even mean. To be honest, I'm not 100% sure how the agency has worked that out. They announced that's what they were doing, and we thought about it and decided the best way to proceed is just to, they said we're not going to revoke these charters now. My understanding is once this gets sorted out, then they will come back and do whatever is appropriate. To be honest, I'm not sure how they would be admitting other members if their charter has been approved on the basis of their combined statistical area, but perhaps NCOA can answer that. You don't have a sense of what that means to say, recede from the combined and just admit members. The concept was that there would not be any new people who would be admitted on the basis that they live in a combined statistical area. That, I think, is what NCOA has instructed these 10 or so credit unions to do. They'd have to pick one core-based statistical area and just define themselves. This may be what you're asking about. The way the system works, as I understand it, you have an approved community. You apply for it and it gets approved. For these credit unions, their approved community is the combined statistical area. It may be, as you're suggesting, that they said just pick one, pick a core-based statistical area. If I could say a few words about rural district. One of the things we want to emphasize on rural district is that there is no dispute, as the district court said, about the meaning of rural. It means pastoral countryside, not urban. It's defined in contradistinction to urban. We think one of the real problems with expanding the size of rural districts from 250,000 people to a million people is that now very large cities can be wholly included in rural districts. We gave an example on page 57 where Denver, Colorado, 57 of our red brief, where Denver, Colorado with over 600,000 people and Salt Lake City with over 186,000 people can be included in a rural district. That then becomes almost 90% of the total population is urban, not rural. Yet, the way NCUA has defined rural district, that counts. We think that is just unreasonable. By the way, my understanding is for all of these, for all three that we're talking about, combined statistical area, rural district and core based statistical area, the review of the business plan is simply to see whether the credit union can serve the area that it has chosen to serve. Not whether it was a well chosen area or they should be required to serve some other area. This came up in the district court. If you look at the transcript of the district court argument, NCUA's lawyer specifically said, no, the way the rule works is that the credit union gets to draw the lines and then all that the NCUA looks at is whether the business plan will adequately serve the people living within the lines that have been drawn. It seems to be a little different, but that is not what they've said. We don't see that in the rule. That might be a way to fix this. That would certainly be a possible change. Let me ask you about the rural districts. It's a curious tension between your redlining argument on the core based statistical areas and your rural district objection that they include some metropolitan centers. I mean, you represent bankers, and there's a question for the rural districts of business viability, whether a credit union can stay afloat in very sparsely populated areas of the country. So they've said, well, we're going to, you know, authorize where the average population density is low, and that will sweep in some metropolitan centers. It sounds like what you would require is that they carve out the metropolitan centers in those on average very sparsely populated areas. But then how could any credit union serve those small cities? Well, I mean, we don't want to. The agency has a lot of discretion about what is good policy and what problems rural credit unions may be facing. The record shows clearly that community banks, which do not have the sweeping tax exemption that credit unions enjoy, do very well serving one county or two counties. Community banks aren't restricted to members. They can find business outside of the small city where they may be located, right? Our main argument, as I say, we're not, this one is not a policy argument. The redlining is a policy argument where we think they're arbitrary and capricious, but on rural, it's really, you know, the lines Congress drew and what is a reasonable interpretation of these statutory terms, local community neighborhood, which everybody agrees is very small or rural district. There was no dispute that rural means not urban. So even though it may be desirable as a policy matter to sweep in Denver and Salt Lake City and have 90% of the people live in those two big cities, it's, you know, that's not rural. So that's a limitation that's put in by Congress. So your view is that Congress would need to revisit in order for the Plattsburghs of the world to be able to serve those small cities? Because under your interpretation, you can't go there through rural district. And it's not going to be, I mean, I'm just positing, if the case is that it's not viable for a credit union to serve, a community credit union to serve those small cities. Otherwise, then it's back to Congress. Right, right. And, you know, I think there's a line to be drawn. Even small rural communities would have some sort of town, and of course that could be included. But we think when you get up to Denver and Salt Lake City, and it's almost 90% of the population is highly urban, you're just outside any reasonable range. The other point I want to make about rural district quickly, because I'm not sure it was clear enough in our brief, is if the court allows NCUA to proceed with this definition of rural district, really you have opened the door to eliminating the geographical restriction that Congress imposed for the following reason. NCUA says district has no definite size. That can be quite large. It can be a state. It can be multiple states. They say any area, so long as the average population per square mile of the whole area is 100 per square mile or less. And they say at page 169 of the joint appendix in the final rule, that interaction and common interests among members of a rural district is not necessary. And so we think that's wrong. We think Congress said there has to be interaction and common interests for all credit units, but they said that. When you put those three things together, the average population density of the entire United States is under 100. So we already have a state and all the states around it. We are one step away, and I think if this court says that's fine, that's reasonable, that's within the intent of Congress, there is nothing to stop the agency from saying the United States is a rural district, you can serve any part of a rural district, and therefore the charter could cover. They may not do that, but in the Supreme Court case, in the first national bank case, the reasoning the Supreme Court used, they said you can't have more than one local community, because once you breach that line, it could erase the geographical limitation entirely, and I think basically we're in the same place with the rural district. If this is okay, if you can have a whole state plus all the states that surround it, if there's really no limit on size, and there's no requirement of interaction or common interests, and all that matters is 100 people per square mile, that's the whole United States, and that cannot be reasonable. So you've given me a lot of time. Let me briefly address the core base statistical areas, and I think Judge Henderson, you absolutely had our point about the hub and the spoke and the ham sandwich without the ham. I mean, I think it is a less you didn't say ham sandwich without the ham, but I think it is a version of what happens with the combined statistical areas, less extreme because there is the hub and spoke, but again, the way the concept is defined, it's on a county by county basis, and once you get out in a county and start drawing lines, it can be a rural isolated area with mountains or some other obstruction, so you really don't know what common interests or interaction those people are going to have, including any commuting with the Corps. But the thing we want to stress is the redlining, and you're clearly aware of it. Again, our understanding is, and this is what we think was clearly said in the district court and in the briefs, the credit union gets to draw these lines. It can take a red pen or whatever color pen it wants and draw a line around the city center, and all that NCUA is going to consider is whether the business plan for the part of the suburbs that the credit union has chosen to serve is adequate, and we just think that's arbitrary and capricious. These entities have a special mission to serve people of low income. They are exempt from the Community Reinvestment Act. What about the problem, though, that if you have a metropolitan area that itself is at the population limit, that there is no opportunity for a community credit union to serve St. Louis, they can't serve East St. Louis, or Chicago, they can't serve South Chicago Heights, that you need to have the ability to do the cleanup in the outside areas, because if everybody, you have multiple credit unions all only serving the prior role. The first point I would make is there is nothing in the record to show that all urban cores and all low income cores and all neighborhoods with large minority populations are served by credit unions. That may or may not be true, but it's not in the record. In a redlining case, that's not a defense. You're using redlining, but you're really talking about banking desert, aren't you? Because in a redlining situation, it's qualified people are being turned down based on their race or where they live, whereas here the qualified people are the people who are members, and so the supervisory authority is less of a mismatch to your point than you argue. It's really saying the choice of where to be is being tainted by avoiding the metropolitan center, and that's much more of a banking desert than a redlining concern. I mean, the credit union has chosen to serve the core-based statistical area as their community. They have made that choice, so that's their choice, and then they're saying we'd like to take a red pen and carve out these poorer areas, and it would be one thing if the agency said, well, we're going to take a look at this and see whether there is a banking desert. That would be a different rule. I think we would still have objections to it, but it would be less objectionable, but in the redlining cases, we cited the old Kent case from Detroit. There are a couple of them from Detroit. They said there are plenty of banks that serve downtown Detroit, and that was not a defense. I mean, these cases are not just under the Community Reinvestment Act. They're under the Fair Housing Act and the Equal Credit Opportunity Act, and there is no exemption for credit unions for those acts, but I think this is just going to be a terrible problem, because when the credit unions do these carve-outs, if somebody brings a redlining suit and says, well, this is a violation of the Fair Housing Act or the Equal Credit Opportunity Act, the answer is going to be, well, we applied to a federal agency, the National Credit Union Administration. They approved the service area under a valid regulation, approved through judicial review, and it's the action of the agency approving the service area, and then the people in the urban core, they're not eligible to be members at that point. They're not going to be included in the business plan, and it would actually be illegal for the credit union to serve people outside their It's an arbitrary and capricious argument. That one we're saying perhaps with some further work by the agency, some version of this could be made to work, but just to us it seems it doesn't make sense. It's not reasonable. All right, you've been very patient. Thank you. Thank you. Does Mr. Aguilar have any time? All right, why don't you take two minutes? Thank you, Your Honor. I think most of Plano's arguments here come down to their belief that the agency's categorical rules for defining local communities and rural districts have imperfect applications. They don't defend the district court's What this court in Women Involved in Farm Economics and the Supreme Court in Barnhart v. Thomas recognized is that agencies are permitted to use categorical rules, and specifically administrative proxies. In Women Involved in Farm Economics, it was the definition of person. The agency said that includes a married couple, because this is a statute about making payments, and we think if you're a married couple, you'll have the same interests in the payment, and we want to limit that to you. The response by Plano's in that case was, no, that's an administrative proxy. The court said, right, they can use that. Plano said, well, if they're going to use that, we at least need to be able to show that it doesn't apply in our case, and that we can present documentary evidence, and we actually have separate interests. It doesn't apply. It's wrong to use it. What's your response to Mr. Long's argument that under your definition of rural district, tomorrow the NCUA could define the whole United States as a rural district and authorize community credit unions with population caps to choose anywhere within the rural district, just like in the combined, I mean, in the court-based, not requiring serving the court. No, in that case, you would need to raise the population cap of a rural district from 1 million to, I guess, the population of the entire United States. That would most likely be arbitrary and capricious. I don't know of a reason or what they're noting is, if you look at page 57 of the red brief, they include two cities, and then they include a whole lot of rural counties in between. And if you're going to be chartered for that, you need to be able to serve everyone who lives in all of those rural counties. You need banks and establishments to be able to market and reach out to these people and convince them that you should join your credit union and become members, and be able to be economically viable to do that. That's reaching out to rural people, and that's an effective use of the agency's workforce. I just have one more question, which is, I think, puzzling in looking at this scheme. Some of the more quaint legislative history that is referenced by the bankers involves, you know, people agreeing with a handshake and knowing one another as neighbors, and therefore being less likely to default, being better credit risk. It seems like we're decades past that. The old rule, the new rule. What meaningful role does something like commuting interchange play in the world of banking? So I understand conceptually that we're using population and commuting interchange as a stand-in for that, but is it a meaningful stand-in? And if so, how? Well, yes, I think it's a meaningful stand-in. I think you're right that originally credit unions were very small, and that Congress wants there to be local community, but it expressly delegated out to the agency what that means. And we've crossed this bridge. They're no longer very small, and everyone agrees that they don't have to be. As we said, San Bernardino County, an enormous geographic area, is a local community. Cook County, with an enormous population. Los Angeles County, with an enormous population. A local community, and everyone agrees with this. What the common bond does is it establishes some amount of cohesiveness into the credit union, and makes sure that the credit union can draw from and serve a solid membership base, and that it can market appropriately and be economically viable and provide those services to people. And that's what the common bond does. And specifically in the rural area, the common bond is necessarily less, because people are spread out across a large rural area. But they are in a rural area, and the credit union is serving them there. And that's still the common bond. It furthers Congress's purposes here. All right.
judges: Henderson, Pillard, Wilkins